HELLENIC LINES, LTD., Plaintiff,

v.

COMMODITIES BAGGING & SHIP-PING, PROCESS SUPPLY CO., INC., Sky Ventures, Ltd., Commodities Inter-national, Inc., Edward Mezvinsky and Melvin Fields, Defendants.

Civ. A. No. 81–3837.

United States District Court, D. New Jersey.

June 14, 1985.

Thomas R. Denniston, George Koelzer, Evans, Koelzer, Osborne & Kreizman, Red Bank, N.J., for plaintiff.

George W.C. McCarter, McCarter & English, Newark, N.J., for defendants.

GERRY, District Judge.
Because the soy wasn't bagged,
The ship didn't wait.
On this point the lawyers gagged:
Demurrage or dead freight?
Were that all that was involved,
I might avoid appellate censure.
Alas, also on me has devolved
The question of joint venture.

This is a suit on a liner booking note negotiated between plaintiff, Hellenic Lines, Ltd., and defendant, Commodities International. The plaintiff claims that the defendant breached the booking note by failing to load cargo when the plaintiff's ship, the Hellenic Pride, was ready to receive it. This alleged breach is said to give rise to a claim for dead freight. The plaintiff also contends that there existed a joint venture between Commodities International and the remaining defendants. If so, then these defendants would also be liable for the breach of the booking note. Alternatively, plaintiff contends that Commodities International was acting as the agent of Process Supply in negotiating the liner note.

The defendants maintain that it was plaintiff, not defendants, who breached the liner note.[1] But, the defendants argue, even if they breached the booking note, their breach would at most give rise to a claim for demurrage; but no demurrage may even be collected due to the Hellenic Pride's haste in leaving the Port of Camden. Moreover, defendants state, no joint venture was ever created between the defendants, nor was an agency created. Therefore, the plaintiff has no claim against any party except Commodities International.[2]

This matter was tried without a jury on June 25, 26, 27 and July 2, 1984. The following shall constitute the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. *Parties*

1. Plaintiff Hellenic Lines, Ltd. (hereinafter "Hellenic Lines") is a Greek corporation with headquarters in Piraeus, Greece, and was at all relevant times the owner of the vessel M/V Hellenic Pride.

2. Defendant Process Supply Co., Inc. ("Process Supply") is an export trading company located in Muncie, Indiana.

3. Defendant Melvin C. Fields ("Fields") was president of Process Supply at all times relevant to this action.

4. Defendant Edward M. Mezvinsky ("Mezvinsky") is an attorney licensed to practice law in Pennsylvania and is also active in various business and civic ventures. Mezvinsky is the owner of defendants Commodities Bagging & Shipping, Ltd. ("Commodities Bagging") and Sky Ventures, Ltd. ("Sky Ventures").

5. Commodities Bagging was a newly formed corporation at the time the transactions underlying this lawsuit took place, and its intended purpose was to bag commodities for shipment overseas.

6. The sole involvement of defendant Sky Ventures in this case was as the agent in New Jersey for Commodities Bagging; at the time of the events underlying this suit, Mezvinsky believed that Commodities Bagging itself had not yet obtained authority to do business in New Jersey.

7. Defendant Commodities International, Inc. ("Commodities") was at all relevant times an unincorporated business entity with a principal place of business in Des Moines, Iowa. Commodities became incorporated under the laws of Iowa on February 19, 1982, but is now apparently defunct. Commodities is in default in this lawsuit.

8. The owner and principal of Commodities was Harold Eugene Pietsch ("Pietsch"), who has not been named as a defendant in this action.

### B. *Process Supply's Egyptian Venture*

9. In October 1981, Process Supply entered into a contract to sell bagged soybean

---

**1.** Defendants counterclaimed for damages based on plaintiff's alleged breach. During the course of the litigation, the plaintiff declared bankruptcy. At trial, the counterclaim was dismissed, without prejudice to defendants' right to file a claim in the bankruptcy proceeding. The counterclaim, therefore, is no longer at issue in this court.

**2.** Commodities International has not defended in this action. A default was entered against this entity on January 13, 1983. During the course of this trial, plaintiff moved for default judgment against Commodities International.

meal to a customer in Egypt. There was to be an initial shipment of 2,000 metric tons in December 1981, with eleven additional shipments of equal size to follow, on a monthly basis. The price that the customer agreed to pay for the first shipment was $340 per metric ton, C & F Alexandria, Egypt.[3] Process Supply's partner in this deal was the Amerex Intertrading Corp., with which Process Supply was planning on splitting its profits on each shipment 50/50. (*See* Defendants' Exhibit A.)

10. Process Supply was to be paid for the December shipment by a letter of credit to be issued through the UBAF Arab American Bank. The initial beneficiary on the letter of credit was the Fortrado Trading Co.; but on October 27, 1981, the letter was partially transferred to Amerex. On November 6, 1981, the letter was transferred again, to Process Supply. However, the letter of credit came to Process Supply in nontransferable form; that is, Process Supply could not further assign its interest to any other party. Moreover, Process Supply believed that the letter of credit was only valid until December 11, 1981, by which date Process Supply would have to present an on-board bill of lading for the soybean meal in order to receive payment.

### C. *Commodities International Enters the Picture*

11. Process Supply had, by early October, therefore, a contract to ship bagged soybean meal; but at the time it entered the contract, it had neither soybean meal, nor bags, nor a means of getting the bagged meal to Alexandria. Process Supply initially contacted the firm of Central Soya of Fort Wayne, Indiana, to see if the latter could supply the bagged meal. Central Soya, as its name implies, had no shortage of soy meal, but it did not have bagging facilities. Central Soya suggested that Process Supply contact Mr. Pietsch of Commodities International. Central Soya apparently believed that Mr. Pietsch's company had some expertise in the bagging and export of agricultural commodities.

12. Process Supply heeded Central Soya's suggestion and contacted and solicited a bid from Commodities International. It would appear that for the price of $337 per ton, Pietsch was willing to supply the 2,000 metric tons of soy in bagged form and make all arrangements and bear all expenses for shipment to Alexandria from the Port of Camden. However, Pietsch's offer was contingent upon Process Supply's ability to assign to Pietsch a letter of credit. (Defendants' Exhibit B.) Process Supply accepted Pietsch's offer. At the time of the parties' agreement, October 20, 1981 (Defendants' Exhibit C), Process Supply did not yet know its letter of credit would be non-transferable; indeed the letter had not yet been transferred to Process Supply.

13. As this transaction stood on October 20, 1981, then, Process Supply was to make a profit of $3,000 on the December shipment ($340 minus $337, multiplied by 2,000, and divided 50/50). Fields testified that he expected profits to increase on future shipments or future ventures. Pietsch was to make as a profit the difference between $337 per ton and the cost of acquiring the soy, bagging it, and shipping it.

### D. *Enter Mezvinsky*

14. In theory, Process Supply's arrangement with Pietsch was designed to eliminate the need for any further participation by Process Supply other than that of supplying Pietsch with capital. All responsibility for bringing about the shipment was to rest with Pietsch and Commodities International. Shortly after the October 20, 1981 agreement, therefore, Pietsch traveled to Camden to inspect the port's facilities for the bagging and loading of grain. While there, Pietsch came into contact with Edward Mezvinsky through the latter's partners in Sky Ventures. Pietsch asked Mezvinsky if he (Mezvinsky) could assist in finding space at the port for

---

**3.** C & F Alexandria, for the uninitiated, means: cost and freight; that is, $340/ton includes the cost of the commodity as well as the cost of getting it to the Port of Alexandria.

Commodities International to bag the meal and in obtaining stevedoring services. Mezvinsky agreed to provide Pietsch with the requested assistance.

15. It would seem that Pietsch, because he had no experience in bagging and exporting on the east coast, had sought out someone who had contacts in the Port of Camden and was knowledgeable about its practices. That person, Pietsch was led to believe, was Mezvinsky.

Mezvinsky's motivations for initially dealing with Pietsch are less clear. Mezvinsky testified that he was very much interested in promoting the east coast generally and Camden particularly as a viable situs for the export of grains. He stated that he believed exporters typically bypassed the ports of the east coast in favor of those in the Gulf of Mexico. Mezvinsky believed that by successfully assisting Pietsch he might send a message to other shippers.[4] Mezvinsky stood personally to gain from heightened activity in Camden since his companies, which were set up to bag commodities, were in a start-up phase. Although the court has no reason to doubt Mezvinsky's wider ambitions for the port and his companies, neither can the court rule out that, for Mezvinsky, Pietsch from the outset represented a potential source of business and profit for his bagging operations.

### E. *Lining Up a Ship*

16. Also in late October 1981, Pietsch began looking for an overseas vessel to carry the soy meal. He contacted Gary Campbell, a shipbroker in Montreal, Canada, and asked Campbell to locate a ship ready to sail by December 10. Mr. Campbell then contacted Henning Isbrandtsen, a shipbroker in New York, informed him of the type of cargo Pietsch sought to ship and authorized Mr. Isbrandtsen to seek a vessel able to sail by December 10. Isbrandtsen advertised the cargo on the TNT

News Service.[5] Isbrandtsen was contacted by Hellenic Lines, the plaintiff, and told that Hellenic Lines was interested in carrying the bagged soy meal. Negotiations ensued between Hellenic Lines and Pietsch, with Isbrandtsen and Campbell acting as middlemen and doing all of the talking, at least up until the final agreement (the liner booking note). The negotiations appear to have occupied several weeks. The product of these negotiations (the November 25, 1981 liner note) will be discussed in more detail below.

### F. *The Best Laid Plans ... I*

17. On November 6, 1981, Mr. Fields realized that Process Supply's letter of credit was nontransferable. Since Process Supply's agreement with Pietsch was contingent on the assignment of letter of credit proceeds to Pietsch, the letter of credit's nontransferability presented the parties with a problem. Pietsch made it clear to Fields that he did not have the capital to finance the purchase of soy meal from Central Soya, and that Central Soya would not ship without surer financing. At that point, Fields could have cancelled his arrangement with Pietsch, but he did not. Fields explained that, having committed himself to provide Pietsch with a source of capital and a business opportunity, he felt obligated to go through with the deal. Equally important to Fields was the fact that Pietsch had already obtained a price commitment from Central Soya on the 2,000 metric tons of meal. Rather than deal anew with Central Soya and risk the possibility of a rise in the commodity's price, Fields decided to stick with Pietsch and Commodities International, if a new means of financing could be worked out.

18. On November 20 or November 21, 1981, Pietsch, Fields and Mezvinsky met in Camden. The court assumes and finds that alternative methods of financing the

---

**4.** At the very least, he might induce Pietsch to ship through Camden again.

**5.** The TNT News Service, for the unschooled in the practice of maritime commerce, is a com-

modities news service that puts out over a teletype or telex machine offers of cargo and other matters.

purchase and shipment of the soy meal were discussed at this meeting. Also at this meeting, Fields inspected Pietsch's operation and equipment and got to know Mezvinsky's partners. It was also decided, apparently, that employees of Mezvinsky would assist in the bagging of the loose soy that arrived in Camden.

19. On November 23, 1983, Pietsch, Fields and Mezvinsky met once again, this time at the offices of Process Supply in Muncie, Indiana. The parties telephoned Central Soya, which agreed to ship the meal upon the receipt of a cash advance of $150,000, with the balance of approximately $250,000 to be paid from the proceeds of Process Supply's letter of credit. Pietsch, Fields and Mezvinsky were each to advance $50,000 toward the initial cash payment, and each was to personally guarantee one-third of the balance owed. When it became apparent that Pietsch could not come up with his cash share, Central Soya agreed to ship the grain upon receipt of $100,000, representing $50,000 shares from Fields and Mezvinsky only.

20. Pietsch testified, and the court finds, that at the Muncie meeting the parties also discussed the possibility of future shipments for the remaining eleven months of Process Supply's Egyptian contract.

21. On November 23, Fields wrote a $50,000 check to the order of Central Soya (Defendants' Exhibit F). Mezvinsky returned to Philadelphia, and, on November 24 or November 25, he met with William Hawkins, Assistant Vice President of the Continental Bank. Following their discussions, the bank agreed to loan Mezvinsky $50,000 at the prime rate plus ½%, with the loan repayable in 33 days. An internal memorandum signed by Hawkins (Plaintiff's Exhibit 26) characterized the loan as one to be used by Mezvinsky "in order to make a business investment." In his testimony, unfortunately, Hawkins was unable to recollect what, if anything, Mezvinsky had said about the "investment." On No-

vember 25, 1981, a wire transfer of $50,000 was made by the Continental Bank, and Central Soya's account in Fort Wayne, Indiana, was credited in this amount. (Plaintiff's Exhibit 23.)

22. On November 23, 1981, Central Soya prepared two sales contracts, each covering 1,000 metric tons of soy meal. The contracts list the "Buyer" of the commodity as follows:

Commodities Bagging & Shipping, Ltd.

Commodities International, Inc.

Process Supply Company, Inc.

Sky Ventures, Ltd.

Michael C. Fields, personally

Eugene H. Pietsch, personally

Edward M. Mezvinsky, personally.

The contracts are signed for the "Buyer" by Mr. Fields and further provide that the goods are to be shipped to Commodities Bagging at the Broadway Terminal, Port of Camden. (Defendants' Exhibits G and H.) Invoices executed by Central Soya on November 25, the date the soy meal was loaded for rail transport to Camden, name the consignee as Process Supply Company and also make reference to Commodities Bagging. (Defendants' Exhibits K and L.)

23. It was anticipated that once the soy meal arrived in Camden, Pietsch would meet it and begin the bagging operation.

### G. *The Liner Booking Note*

24. Meanwhile, throughout November 1981, negotiations progressed for the ocean passage of the bagged soy meal. At some point, the treasurer for Hellenic Lines made a rather perfunctory check into the financial status of Commodities International, with which Hellenic had never before dealt. The treasurer called Sam McHose, a financial officer of Pietsch's bank in Iowa, the Nevada National. McHose apparently said little but gave a vaguely positive reference regarding Pietsch's company.[6]

---

**6.** Apparently some time earlier, McHose had spoken to Mezvinsky about Pietsch. Mezvinsky too was interested in Pietsch's financial status.

McHose had stated that he thought Pietsch was reliable. Presumably, McHose's opinion was a factor in Mezvinsky's decision to deal with

25. The result of the negotiations was an agreement that Hellenic Lines' vessel, the M/V Hellenic Pride, would carry the cargo to Alexandria at a rate of $60 per metric ton (for a total cost of $120,000). The agreement was embodied in a writing—the liner booking note—dated November 25, 1981. The only parties to the booking note are Hellenic Lines, the "carrier," and Commodities International, designated as the "merchant."

26. The booking note states, in pertinent part:

The time for shipment shall be about December 3–10. (¶ 2.)

This paragraph merely sets a ballpark range for when the vessel would be available for loading.

The goods to be loaded free of expense to vessel under deck. (¶ 4.)

This paragraph indicates that the loading of the cargo is the obligation and for the account of the merchant, not the carrier. (The opposite of "free in" terms, such as are indicated in ¶ 4, are "liner terms," in which the cost and obligation of loading are borne by the carrier. *See* ¶ 20 *infra.*)

Loading, Discharging and Delivery of the cargo shall be arranged by the Carrier's Agent unless otherwise agreed.... The Merchant or his Assign shall tender the goods when the vessel is ready to load and as fast as the vessel can receive and—but only if required by the carrier—also outside ordinary working hours notwithstanding any custom of the port. Otherwise the Carrier shall be relieved of any obligation to load such cargo and the vessel may leave the port without further notice and dead freight is to be paid. (¶ 8.)

Notably, ¶ 4 changed the ordinary expectation that loading would be arranged by the Carrier. Whether the remainder of ¶ 8, in light of this change, was still applicable will be explored below, as will the term "dead freight."

Time to commence at 1 P.M. if notice of readiness to load is given before noon, at 8 A.M. next work day if notice given during office hours afternoon, notice to be given merchants representative load port (¶ 17).

The "notice of readiness" pins down with greater precision when the boat will arrive in port and be ready for loading. It can be viewed as a revision of the approximation ¶ 2 of the liner note provides. This paragraph provides that once the notice is given to the merchant's representative in the Port of Camden, the merchant is to begin loading, either the day notice is given or the following day, depending on when notice is given.

Time for loading, 3 total days (24 Hrs.), WWSHEX, UU, if expected time used, then actual time used to count (¶ 18).

This paragraph provides that once loading is scheduled to commence (according to the terms of ¶ 17), the merchant has three days to complete the loading or, in maritime parlance, three "lay days" during which the merchant has free use of the vessel. In calculating the running of the three days, the paragraph provides that only "weather working" (WW) days—that is, days where weather permits loading—are included; Sundays and holidays are excluded (SHEX), unless they are used (UU), in which case they are included for the purpose of calculating the three days.

Demurrage USD 6000/day pro rata, half despatch. (¶ 19.)

This paragraph provides for the payment by the merchant of demurrage of $6000 per day, or the payment by the carrier of despatch of $3,000 per day, whichever is appropriate. These terms will be further discussed below.

Full liner terms discharge (¶ 20).

The remaining paragraphs provide that the note is entered into subject to final approval by November 30; that Isbrandts-

Pietsch. At the time of this earlier conversation, Pietsch owed the Nevada National Bank $100,000. One may wonder whether this fact colored McHose's evaluation. Later, when

speaking with Hellenic's treasurer, McHose stated that he based his positive evaluation on the fact that Pietsch was associated with Mezvinsky.

en is to be paid a commission for having arranged the deal; and that Commodities International is to pay in full for the service three days after the release by the vessel of a signed bill of lading (¶¶ 21, 22, 23).

The liner note was not signed by the parties to it. There was testimony, however, the liner notes are binding in the industry without signatures.

That section of the note in which the description of the goods to be carried is inserted was also left blank. Apparently, this is not uncommon either. The description of the cargo subject to the liner note was "fixed" in telexes between the parties to the note and the brokers, which telexes were dated December 1 and 2, 1981. These telexes also indicated that the M/V Hellenic Pride would arrive in Camden and be ready to receive the cargo on Sunday, December 6, if the shipper wishes, or else on Monday, December 7, 1981. (Plaintiff's Exhibits 3 and 4.)

H. *The Best Laid Plans … II*

27. The loose soy meal was shipped by Central Soya on or about November 25, 1981, and arrived in Camden on or about December 1. Pietsch arrived in Camden about the same time as the soy meal.

28. In the meantime, Fields arranged for the purchase of polypropylene bags for the soy. An invoice of the St. Louis Bag Company, dated December 1, 1981, names the consignee as "Process Supply Company, c/o Commodities Bagging and Shipping." (Plaintiff's Exhibit 50.) The bags did not arrive in the Camden port until late on December 3.

29. On December 4, 1981, Mr. Mezvinsky entered into a lease with the South Jersey Port Corporation in Camden, which covered space in the port for warehousing and loading the soy, as well as some bagging equipment.

30. In late November 1981, George Lair, a maritime consultant with stevedoring expertise, was contacted by the South Jersey Port Corporation. He met with Fields and agreed to help supervise the loading of the bagged soy onto the vessel. He further agreed to loan the defendants some loading equipment. Mr. Lair seems to have been present at the port from December 4 through December 7. At some point, he helped the defendants obtain additional loading equipment, for which he was given a check by Pietsch. When that check wouldn't clear, he was paid by Charles Henschel, a nephew of Mezvinsky.

31. Bagging of the soy began on December 4. From its inception the bagging operation was disorganized and something of a disaster. Although Pietsch was supposed to be in charge of the bagging, according to Mr. Lair, the lines of command were less than clear. Apparently Pietsch called Fields on December 4 to say that there were problems with labor and the bagging equipment, and Fields, together with his brother, appeared in Camden that day or the next. Also present at various times were Mezvinsky, his partners and his nephew Henschel. Lair stated that all of these people had a role in the bagging.

32. Pietsch seems to have been completely incapable of leading the operation; he was described, and he described himself, as "strung out" and in a panic. The equipment wasn't working, soy dust was blowing all around, creating a potentially dangerous situation, and the Hellenic Pride's arrival was imminent. To compound the problem, the polypropylene bags Fields had purchased were not well suited for the loading operation, according to Lair, in that they would tend to slip off the loading equipment.

33. Fields seems to have left Camden for Chicago on December 5, when the bagging was still in a state of disarray. However, on December 7, there was a conference call between Fields, Pietsch and Mezvinsky, during which it was decided that Pietsch would be relieved of further responsibility for the bagging. Pietsch went home to Iowa. It was decided that Commodities Bagging, Mezvinsky's company, would be in charge of the bagging, starting December 8, with Henschel supervising.

34. On December 6, a Sunday, the M/V Hellenic Pride docked at its appointed berth in Camden at 9:35 A.M. The following morning, at 10:45 A.M., a "notice of readiness" to receive cargo was tendered by the vessel, but the charterers' agent refused to accept the ship.[7] Earlier, at 8:00 A.M., on December 7, the charterers cancelled their labor for that day; that is, the stevedores who would perform the loading operation were released. (Plaintiff's Exhibits 6 and 8.) As of December 7, approximately 20–25% of the loose soy was in bags and ready to be loaded. (Testimony of Lair, Balzano.)

35. On December 7, Hellenic's port captain asked Lair how long Lair thought it would take for the bagging to be completed. Lair estimated 10 days or more, based on the progress to that point. Lair also communicated his reservations regarding the polypropylene bags. Lair's pessimistic estimates were conveyed to Evans Sismanson, Hellenic's chief executive in New York.

36. According to Henning Isbrandtsen, who was in Sismanson's office on December 7, the latter, when confronted with the less than rosy situation in Camden, attempted to get a report from Pietsch's banker regarding Pietsch's financial strength. The banker was unavailable. Sismanson was inclined on December 7 to have the Hellenic Pride leave Camden immediately, but Isbrandtsen told him it was too soon for the ship's departure.

37. On December 8, no labor was hired for loading of the soy meal onto the Hellenic Pride. (Plaintiff's Exhibit 6.)

38. Also on December 8, Mr. Sismanson received a telegram from Fields. That telegram reads in pertinent part:

1. We are Process Supply Co., Inc.

 . . . . .

2. We have [a letter of credit] covering 2,000 metric tons bagged soybean meal.

 . . . . .

4. We contracted with Commodities International ... Mr. Gene Pietsch to bag meal and transport to Egypt. Commodities International has failed to perform.

5. Operation of bagging has been resumed by our people in Camden, New Jersey.

6. We will contact you via conference call at 10:15 A.M. E.S.T.

(Plaintiff's Exhibit 10.)

39. As promised in the telegram, a conference call was placed on the morning of December 8. The participants were Sismanson, Fields and Mezvinsky. Fields reiterated the information conveyed in the telegram and requested that the Hellenic Pride remain in Camden for the loading and make the voyage to Alexandria.

Sismanson repeatedly asked Fields when the bagging would be completed and the cargo ready for loading but was unable to obtain a firm date. Fields gave only a vague estimate: the end of the week or beginning of the next (meaning Saturday, December 12, or later).

Sismanson also asked Fields if the latter would pay demurrage [8] during the time the vessel would be berthed in Camden. Fields unequivocally refused to pay demurrage.

Thereupon, Sismanson decided to have the Hellenic Pride leave that day. The vessel left at 1 P.M., December 8, 1981.

---

7. The documents covering the tender and refusal refer to the "charterers agent." Whether the agent was the agent for Pietsch only, or for all the defendants is one of the ultimate questions in this case to be decided *infra.* It is not clear from the documents who Hellenic thought the charterer was at this point.

The reason given by the charterer's agent for its refusal to accept the notice of readiness was that the ship's draft was in excess of 22 feet.

(*See* Plaintiff's Exhibit 8.) The court finds this reason entirely pretextual and attributes no importance in this transaction to the ship's draft. The supposed problem with the draft was, in the court's estimation, a manufactured means by which the defendants hoped to buy more time to complete bagging or to extricate themselves entirely from liability to the plaintiff.

8. *See infra.*

40. The court finds that Sismanson decided to move the M/V Hellenic Pride on December 8, 1981 for the following reasons:

No commitment was received from Fields as to when the cargo would be ready for loading.

From the observations of Hellenic personnel on location, Sismanson knew that not more than 25% of the soy was bagged, and that the bagging operation was not moving ahead with much smoothness. He therefore had reason to doubt Fields' vague estimate and place greater reliance on Lair's estimated completion date (December 17–18).

Fields refused to make a commitment to honor the demurrage clause in the liner booking note.

Sismanson therefore had no guarantee that, even if the cargo was loaded reasonably promptly, he would be paid his due under the booking note. Moreover, Sismanson had never heard of Fields prior to December 8, and he had reason to doubt the latter's reliability. Fields' demurrers did nothing to alleviate Sismanson's suspicions. Certainly he had no reason to trust Pietsch at this point either to make good on the demurrage clause or any other aspect of the booking note.

Sismanson had obligations to other shippers besides Pietsch/Fields/Mezvinsky. The Hellenic Pride was engaged in liner service.[9] Accordingly, Sismanson had to consider the expectations of the 250–400 other shippers who had booked passage on the Hellenic Pride. Presumably, a lengthy layover in Camden could have thrown off all subsequent loadings and unloadings at no small cost and inconvenience to these shippers.[10]

41. Following the stopover in Camden, the M/V Hellenic Pride was next scheduled to stop in Paulsboro, New Jersey; St. John, New Brunswick, Canada; and then in Casablanca. Upon reaching the decision not to wait for the soy bags to be loaded in Camden, Sismanson attempted to book additional cargo in Paulsboro and St. John but was unsuccessful.

42. Paulsboro is located just an hour or two upriver from Camden. Hellenic Lines could have therefore gone on to Paulsboro, picked up its load there, and then returned to pick up the soy meal in Camden, without going very far out of its way. The plaintiff chose not to follow this course because it had no guarantee that, upon returning, the soy meal would be ready for loading. Moreover, it was concerned about its potential liability in the event of a mishap, given this proposed deviation from the ship's designated route.[11]

### I. *Demurrage and Dead Freight*

43. If the liner booking note was breached, then some or all of the defendants would be liable for damages for either demurrage or dead freight, two measures of recovery contained in the liner booking note. There is not much disagreement as to how these terms are *defined*, but there is considerable disagreement as to the circumstances under which each term provides the measure of recovery.[12]

9. "Liner service" is a means of maritime commerce whereby a vessel announces a schedule of calls at various ports and accepts cargo from various shippers at each port. The shippers know whether the ship will dock at a location convenient for loading of their goods, where the ship will dock later in the rotation, as well as the approximate dates of dockage.

10. There was no specific testimony about the actual expectations of shippers, e.g., whether time was of the essence in any of the shipping contracts. And there was testimony that docking dates are not precise but may vary a day or two from the previously announced dates. Nevertheless, the number of shippers aboard the Hellenic Pride—without even investigating their actual expectations—was sufficient to cause, and did cause, Sismanson a great deal of concern, which contributed to his decision to move out.

11. There was testimony that the "P & I Clubs" which insure ocean-going vessels may disclaim coverage if a ship changes its route in mid-voyage.

12. The court considers the meaning and applicability of these terms at this point—in the findings of fact rather than the conclusions of law—because these terms, although not infrequently defined and discussed in the case law, have no

■ "Dead freight" can only be defined once "freight" is defined. "Freight," in the maritime industry, refers to the *cost* to the shipper of having his cargo transported from here to there. In the instant case, then, the freight to be paid by the shipper was $60 per metric ton, or $120,000. "Dead freight" is the charge that must be paid to the vessel owner although the cargo contracted to be carried by the vessel is not actually carried. It is a lost opportunity cost. The vessel has set aside so much space for a particular cargo, which, but for that commitment, it could have set aside for another cargo and been paid for carrying. Thus, although the ship sails with empty space—and provides no service to the shipper who has failed to tender its cargo—it has lost money. It is from this situation that a dead freight claim arises. It should be noted that the dead freight charge is equal to the freight charge; here, $120,000.

■ "Demurrage" refers to a fine or payment made by the shipper to the vessel owner if the shipper fails to complete the loading of his cargo within an allowed period of time (the "lay days"). Here, Commodities International had three days to load the soy meal. Assuming that loading had commenced, but had taken four days, Commodities International would have been liable for one day's demurrage, or $6,000.[13]

44. Obviously, if the M/V Hellenic Pride had waited in Camden for the entire cargo to be loaded, the shipper would have been liable for the freight charge ($120,-000), as well as for demurrage of $6,000 per day for each additional day beyond the lay days. Thus, demurrage would have been payable beginning December 10. (Moreover, the vessel would have a lien against the cargo for any unpaid freight and demurrage charges.) Equally obvious is that the Hellenic Pride did not wait and left with "dead space."[14]

The question becomes, then, whether—as "dead freight" and "demurrage" are understood in the maritime industry—the M/V Hellenic Pride had the right to leave and claim dead freight, or whether, under the circumstances, the demurrage provision was triggered, obligating the vessel to remain until the soy meal was fully bagged and loaded.

45. The defendants' expert witness, Henning Isbrandtsen,[15] laid much emphasis on the absence from the liner booking note of a "demurrage clause." A "demurrage *clause*" is one setting the maximum number of days a ship must wait for cargo to be loaded.[16] In the absence of a "demurrage clause," Isbrandtsen testified, the ship was obligated to remain "forevermore"; that is, until loading was completed, however long that took. The vessel's only recourse, according to this witness, was to demand that demurrage be paid during the waiting period; that is, as the demurrage accrued. Where such a demand is refused by the shipper, then the vessel may depart. But, Isbrandtsen said, a de-

independent legal significance. These terms are only significant for what they mean to the parties. The court is interested in the intention of the parties, which must be drawn from the common interpretation of these terms among those familiar with the custom and practice of the maritime industry. Accordingly, each side presented expert testimony regarding the meaning and application of "demurrage" and "dead freight."

13. "Despatch" is the opposite of demurrage; that is, it is a rebate to the shipper if loading is completed in less than the allowed period. If loading here had commenced and been completed in two days, the shipper would have been entitled to $3,000 (since, according to the liner note, despatch is "half" the demurrage rate).

14. "Dead space," for the information of the by-now disaffected reader, is not a maritime term, but a term coined by the court, and roughly analogous to the more commonly used term, "dead time."

15. The Henning Isbrandtsen who brokered the instant transaction.

16. In this case, for example, had there been a demurrage clause providing only two days' demurrage, the vessel, according to Isbrandtsen's interpretation, would have been privileged to leave the port after five days: the three lay days plus the two demurrage days.

mand for demurrage may not properly be made until the expiration of the lay days. Hence, no demand could be made here.[17] Under Isbrandtsen's interpretation of the note, then, plaintiff may receive neither demurrage nor dead freight.

46. Plaintiff's expert, Michael van Gelder, understood demurrage quite differently. He stated that a demurrage provision (as distinguished from a demurrage *clause*) is only triggered where the *completion* of loading extends beyond the lay days. Thus, so long as there is a *continuous* flow of cargo onto the vessel, however slow that flow, the vessel is obligated to wait for the loading to finish and can only make a claim for demurrage. But, where the shipper is unable to commence loading, or if at any point the loading, once commenced, ceases, the vessel—unless it would be unreasonable to do so, or unless the contract otherwise forbids it—may sail and claim for dead freight on the cargo not loaded. Mr. van Gelder disagreed with the suggestion that demurrage is triggered, not only by a delay in the completion of loading, but also by an initial failure to supply any cargo at all.

Under Mr. van Gelder's interpretation, then, it would not have been necessary for the defendants to have all the soy bagged when the vessel arrived. All that the defendants would have had to do to take advantage of the demurrage provision was to begin loading the soy that *was* bagged. While this was occurring, they could have continued the bagging, and then loaded the newly-filled bags, so long as they were able to maintain a continuous flow. (Of course, having released stevedores for both December 7 and 8, defendants could not do this.)

47. The court found Mr. van Gelder's background, qualifications and testimony far more impressive and credible than Mr.

Isbrandtsen's. Furthermore, cross-examination of Mr. Isbrandtsen gave the court some reason to doubt his independence. (*See* Trial Transcript at 694 *et seq.*)

Therefore, the court accepts Mr. van Gelder's testimony to the effect that the booking note's demurrage provision was never brought into play in the instant case. Whether the shippers breached the liner booking note so as to be liable for dead freight shall be discussed below.

## J. *Denouément*

48. After departing the Port of Camden, the M/V Hellenic Pride continued on its scheduled course, stopping in Paulsboro, St. John, Casablanca, Pylos, Calamata, Piraeus, Port Said, Aquaba, Jeddah, Port Sudan, Djibouti, and in several other interesting locations, before returning to the less exotic ports of the eastern seaboard of the United States. (Plaintiff's Exhibit 20.) By not having to stop in Alexandria, plaintiff saved approximately $27,000 in dockage and stevedoring costs.

49. Process Supply subsequently shipped the soybean meal to Egypt on another vessel at a higher freight rate. The loading of that second ship was accomplished December 17–19, 1981. (Defendants' Exhibits Q and S.) Process Supply sustained a loss of approximately $43,650 in this grain shipment (Defendants' Exhibit T), and Process's partner wisely decided not to exercise its option on the remaining eleven monthly shipments.

50. Needless to say, this minor maritime fiasco sent little ripples and shock waves as far afield as Des Moines, Iowa and Piraeus, Greece. Pietsch decided a couple of months afterward to incorporate his struggling company, Commodities International, and declare bankruptcy. With-

---

17. Mr. Isbrandtsen also testified as to inconsistencies between paragraphs 8 and 18–19 of the liner note (covering dead freight and demurrage respectively) and the effect of such inconsistencies. Conversely, the plaintiff's expert found no inconsistency between these paragraphs. The matter of inconsistencies and their effect is a question of contract interpretation for the court, not the witness, to decide. *See infra,* in legal analysis. The witnesses' testimony was sought for the meaning and applicability of terms in the contract, not for a determination of the relationship between contract clauses.

in another year or so, Hellenic Lines also declared bankruptcy.

51. Process Supply and Mezvinsky's companies, Commodities Bagging and Sky Ventures, apparently are still viable entities.

52. Mezvinsky never received back his full $50,000. Apparently, at some point Fields gave him a check for $30,000.[18]

*Legal Analysis*

There are two issues before the court: (1) Did Commodities International breach the liner booking note so as to give rise to a claim for demurrage or dead freight; and if so, (2) Were the other defendants in this case involved in a joint venture or agency relationship with Commodities International so as to render them jointly and severally liable for demurrage or dead freight. Also at issue are prejudgment interest and attorney's fees.

A. *The Breach of the Liner Booking Note*

The court has already found, as a matter of fact, that the demurrage provision of the note (¶ 19) was not triggered by the facts of this case. The defendants nevertheless urge that the court follow *Gloria Steamship Company v. India Supply Mission,* 288 F.Supp. 674 (S.D.N.Y.1968), which, it is argued, dictates a contrary conclusion. In the *Gloria Steamship* case, the court stated:

> [where] there is no express exception, the demurrage clause covers delays during the process of loading, including the not uncommon one of *failure to supply cargo.*

*Id.* at 676 (emphasis added). This statement is taken from a prior case, *Intercontinental Transportation Co. v. India Supply Mission,* 261 F.Supp. 757 (S.D.N.Y. 1966), where the statement reads as follows:

> Where there is no express exception, a demurrage clause, by settled construc-

tion, covers all delays during the process of loading, including failure to supply *sufficient* cargo.

*Id.* at 758 (emphasis added). The statement in its earlier, more accurate form, then, does *not* suggest that the total failure to supply *any* cargo at all—the case here—is within the ambit of a demurrage provision. Demurrage refers to a delay in the *process* of loading—as Mr. van Gelder testified—not a failure to load at all. Thus, these two cases do not support the defendants' position. Moreover, a careful reading of these cases indicates that they do not deal with the issue of whether a demurrage provision or a dead freight provision governs, but rather whether a demurrage provision takes precedence over the non-contractual remedy of detention damages.

In the absence of an express demurrage clause, the common law imposes on the shipper an obligation to load within "a reasonable time" and failure to do so gives rise to a claim for detention damages, normally based on a ship's charter hire rate. *Id.* A demurrage clause is merely a contractual liquidated damages provision, which imposes a more certain, precise measure of damages. The question in the two cases under discussion was whether the demurrage provision covered *all delays* in the process of loading, or whether some delays were still governed by the non-contractual remedy. It was in this context that the statement under discussion was made. In sum, then, we do not find these cases contrary to our own findings regarding the meaning and applicability of ¶ 19 of the booking note.

We turn next to the dead freight provision of the note, ¶ 8. To review, this reads, in pertinent part:

> The Merchant or his Assign [Commodities International] shall tender the goods when the vessel is ready to load and as fast as the vessel can receive.... Otherwise the Carrier shall be relieved of any obligation to load such cargo and the

---

**18.** Fields also gave him an indemnity agreement for loss arising out of this transaction. That

agreement is not before the court.

vessel may leave port without further notice and dead freight is to be paid. It seems reasonably clear that Commodities International breached this provision. The M/V Hellenic Pride gave notice of its arrival date as early as December 1 or 2, and gave its formal notice of readiness on December 7. Under ¶ 2 of the booking note, the shipper should have been ready to begin loading·on or about December 3. Thus, there was no surprise to the shipper here. And further, as later events unfolded, the plaintiff had no reason to expect that loading would take place December 7 or 8, and no reason to have great faith in either Pietsch or Fields vis-a-vis the shipping contract. The court finds that plaintiff's exercise of its contractual right to leave the port was reasonable, and accordingly, that dead freight may be claimed.

The defendants argue that ¶ 8 does not apply because of the loading arrangements between the parties. Paragraph 8 is a preprinted clause on a booking note which ordinarily covers "liner terms" (where the vessel does the loading). Here, the shipper was responsible for the loading. The defendants state, therefore, that ¶ 8 should be stricken, since it purports to relieve the vessel of an obligation "to load" and makes dead freight available for the shipper's failure to "tender." But, the defendants argue, the vessel had no obligation to load, the shipper had no obligation to tender, and therefore the provision makes no sense.

■ The court does not agree. The defendants over-read to their advantage the phrase "the carrier shall be relieved of any obligation to *load* such cargo." In the present context, the court construes "to load" to mean "to receive for loading." Such a reading is harmonious with the obvious intent and purpose of the paragraph to protect the interests of the carrier in maintaining services to other shippers with cargo aboard, regardless of which party bears the cost and responsibility for the actual loading. The failure of the shipper has precisely the same adverse impact upon the liner's interests, regardless who does the loading. The court does not believe that

the accident of who shall bear the costs of loading should be permitted to vitiate the clearly identified rights and interests the paragraph addresses.

■ The defendants next contend that paragraph 8 is inconsistent with paragraph 18, and that paragraph 18, which is typewritten (not pre-printed), therefore is controlling. The court has no argument with the proposition that a later-drafted typewritten provision supersedes an inconsistent printed provision. But if the provisions are not inconsistent, each remains in force.

Here, the defendants argue, ¶ 8 governs where the vessel does the loading; and under ¶ 8, the vessel may leave at any time if the cargo is not tendered. But ¶ 18 ("Time for loading, 3 total days"), it is argued, governs where the shipper does the loading and vests the shipper with an absolute right to the full three days of lay time.

■ Some support might possibly be drawn for this contention from the *Intercontinental Transportation Co.* case, *supra*, wherein the court stated:

> The charterer [here, the shipper] is not liable for any delay which occurs within the lay days and during the actual process of loading. The charterer is entitled to keep the ship the whole of the lay days even though he could have loaded her in less time.

261 F.Supp. at 758. Again, however, consistent with the definition of demurrage in that case, this statement is predicated on a delay within the lay days during the *process* of loading and does not address a complete failure to tender any goods for loading within the lay days. Thus, where no goods at all are forthcoming, we hold that the shipper does not have an absolute right to its lay days. Such a right, particularly in view of the vessel's obligations to other shippers, must be less than absolute.

Of course, defendants' argument is also considerably undercut by our interpretation of the language of ¶ 8, *supra*.

For all of the reasons stated above, the court holds that the shipper breached the

liner note and is liable for dead freight. The shipper is entitled to certain deductions from the $120,000 claim, which will be dealt with below.

## B. *Joint Venture?*

Having decided that Commodities International, the signatory to the booking note, is liable on the note, the court must decide whether the remaining defendants are liable as well, by virtue of the existence of a joint venture involving Commodities International and these remaining defendants. Any joint venture, to form the basis for liability, would have to include Commodities International, the only party to the contract with plaintiff.

Although there might be some ground for debate as to what jurisdiction's law governs the question of joint venture, the parties have chosen to save their breath for the other issues in this case. The court will therefore apply New Jersey law to the extent it becomes necessary to make a choice. We recognize that there are not great differences in how different jurisdictions define joint ventures, however.

 The elements of a joint venture are virtually identical to those required for a partnership. *Kozlowski v. Kozlowski,* 164 N.J.Super. 162, 395 A.2d 913 (Ch.Div. 1978). The only difference is that the character of the joint venture relationship may be more informal and is usually limited to a single undertaking or transaction, although the conduct of that enterprise may continue for a number of years. *Cooperstein v. Shapiro,* 122 N.J.Eq. 238, 192 A. 826 (E. & A. 1937). The *sine qua non* of a joint venture is a contract, express or implied; that is, an actual *agreement* between the parties. *Sullivan v. Jefferson, Jefferson & Vaida,* 167 N.J.Super. 282, 400 A.2d 836 (App.Div.1979). This agreement need not assume a particular form, or be formally executed, but may be implied wholly or in part from the acts and conduct of the parties. *Kozlowski, supra; Wittner v. Metzger,* 72 N.J.Super. 438, 178 A.2d 671 (App. Div.1962). *Accord, Beavers v. West Penn Power Co.,* 436 F.2d 869 (3d Cir.1971)

(Pennsylvania law). In addition to the requirement of an actual agreement, the following elements must also be present:

(A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

(B) A joint property interest in the subject matter of the venture;

(C) A right of mutual control or management of the enterprise;

(D) An agreement to share in the profits or losses of the venture.

*Wittner v. Metzger, supra,* 178 A.2d at 675 (taken from 2 *Williston,* Contracts (3d ed. 1959), § 318A). Although a joint venture is not present absent a *right* of mutual control, mutual control over every aspect of the venture need not be actual. "A joint adventurer may entrust actual control of the operation to his co-adventurer and it still remains a joint venture." *Wittner,* 178 A.2d at 676. Similarly, joint venturers may agree that responsibility for particular tasks shall reside with less than all the venturers.

It is, of course, far easier to determine the relationship between parties where there is a writing setting forth the parties' understanding. Here, the court is not so lucky. All we have are the meetings of the parties, their various acts, and various invoices and checks. But we may certainly fill in the picture and draw such inferences as are reasonable from the outlines we have.

It seems useful to consider two time frames separately in evaluating the parties' relationship: pre-November 6 and post-November 6, 1981. November 6, the beleaguered reader will no doubt recall, was the date on which Mr. Fields came to the realization that his letter of credit was non-transferable.

 Prior to November 6, the court believes that the evidence and inferences therefrom are insufficient to establish a joint venture. There seem to have been two distinct transactions that were to have been handled independently and to have

given rise to separate profits: there was a deal between Fields and a purchaser in Egypt whereby Fields would supply bagged soy meal; then there was a deal between Fields and Pietsch whereby the latter, relying on the former's letter of credit for capital, would actually make all the arrangements necessary to accomplish the Egyptian deal. Pietsch would acquire the soy, transport it to Camden, have it bagged, and arrange for its overseas shipment. It appears that in furtherance of these responsibilities Pietsch called on Mezvinsky for assistance. There is no indication that, when the Fields-Pietsch deal was struck, Fields intended to participate in any of Pietsch's arrangements. Nor is there any indication of an intention to *share* profits. Although the parties may have each anticipated profits severally, that is not sufficient to create a joint venture. *In re Longhorn Securities Litigation*, 573 F.Supp. 255, 271 (W.D.Okla.1983). A joint venture seems to require something like a pooling of profits, and then a subdivision at agreed-upon percentages. As originally structured, the two deals seem to have been designed to yield separate profits: for Fields, a profit of $3 per ton ($340–$337); and for Pietsch, a profit of $337 per ton minus the cost of the soy meal, the bags, inland transportation, bagging and ocean freight.

On November 6, however, it became obvious that, if Fields and Pietsch were to stay together, their arrangement would have to be restructured so as to make allowance for Pietsch's inability to finance his various operations.

 Pietsch, Fields and Mezvinsky—who by late October, 1981 had become interested in Pietsch's Camden plans—met at least twice in late November, once in Camden and once in Muncie. At these meetings, the court concludes, a joint venture was formed through the agreement of the parties.

Some of the elements of a joint venture are easily met in this case. Regarding the contribution of money, property, effort, knowledge or skill to the common undertaking:

—Process Supply/Fields contributed the Letter of Credit (arising from the Egyptian contract). Further, Fields contributed $50,000 in cash toward the purchase from Central Soya, and also personally guaranteed one-third of the balance due Central Soya. Later, Fields also purchased the bags for the soy and arranged for their shipment to Camden.

—Pietsch contributed his advantageous agreement with Central Soya, a personal guarantee on one-third of the balance owed Central Soya, his efforts in making arrangements with Hellenic Lines, and his alleged expertise in bagging.

—Mezvinsky also contributed $50,000 and his one-third guarantee. He also supplied his alleged knowledge and experience of the Camden maritime industry, arranged for the lease of port space and equipment, and supplied labor through his companies for the actual bagging in Camden.

Regarding the requirement of a joint property interest in the subject matter of the venture, the court is satisfied that the defendants, through their cash advances and guarantees, obtained joint ownership of the soy meal. Our conclusion is buttressed by the sales contracts for the soy meal (Defendants' Exhibits G and H), which list as buyers all the individual defendants and their companies, and also by the December 8 telex from Fields to Hellenic Lines. (Plaintiff's Exhibit 10.)

Regarding the right of mutual control or management of the enterprise, we conclude that this element is satisfied by the evidence. Quite clear is the fact that following the meetings in late November, Pietsch no longer autonomously exercised the total control contemplated by the original Pietsch/Fields agreement. It seems reasonable to infer that during these meetings the defendants decided to divide their responsibilities. Fields undertook the responsibility of purchasing bags and signing the shipping contracts. Mezvinsky made the necessary leasing arrangements in the Port

of Camden. Pietsch, at first, retained the primary responsibility for supervising the bagging.

As events unfolded, these lines of responsibility became increasingly blurred. Fields and Mezvinsky brought in George Lair to supervise the loading and, ultimately, to provide some assistance in obtaining bagging equipment. Mezvinsky's companies played an ever-increasing role in the bagging. And finally, Fields and Mezvinsky undertook to deal directly with Mr. Sismanson of Hellenic Lines. Responsibility for, and control over, payments to suppliers and personnel also shifted from Pietsch alone to all defendants. A telling detail regarding shared control is the fact that Pietsch attempted to pay Lair for some equipment; and when Pietsch's check bounced, Mezvinsky's nephew came forward with another.

Finally, we must address the issue of shared profits and losses, and the question of whether there was a joint venture agreement between the defendants. It is these issues which present the greatest difficulty.

There is no evidence of an agreement to share profits or losses. The defendants steadfastly deny such an agreement and maintain that, despite the parties' commingling of funds, anticipated profits were to be earned separately, with all outlays by Fields and Mezvinsky to be ultimately deducted from the $337 per ton Pietsch was to receive from the proceeds of the letter of credit. Mezvinsky further claims that the $50,000 he remitted to Central Soya was simply a "loan," not an equity investment in the soy meal, and that all he expected out of his involvement in the grain deal was repayment of his loan and the revitalization of the Camden port.

At this point, credibility of witnesses becomes critical. The court simply does not believe much of the testimony of Mezvinsky and a good part of that of Fields. Mezvinsky was consistently reluctant to answer questions, and his answers were evasive and frequently beside the point.

It runs counter to logic and experience that one would borrow $50,000 at the prime rate plus, and thereupon loan it, interest free, to a pair of individuals one barely knew. It seems far more likely that that $50,000—whether viewed as an investment in, or a loan to, the venture—formed part of the basis for a share of the venture's profits. Also counter to logic and experience is the defendants' contention that, despite their enlarged role in the management and financing of the venture, from the grain purchase through the bagging, Fields and Mezvinsky wanted nothing for their efforts but repayment of their capital contributions. Far more likely, the enlarged role entailed an enlarged share of the profits.

The court concludes, therefore, that the defendants did agree to share profits, and more broadly, to enter into a joint venture. If the defendants had been "independent contractors" engaging in separate, interlocking activities, the court does not believe there would have been such a blurring of functions and payments as eventually occurred, or that the parties would have been so incapable of explaining what they had to gain economically from the series of transactions.

Accordingly, we hold that Fields, Mezvinsky and their companies are jointly liable with Commodities International on the liner note.

This conclusion obviates the need to discuss the agency theory proposed by plaintiff.

### C. *Prejudgment Interest*

The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable [such as] unreasonable delay in prosecuting [the] claim; ... a bad faith estimate of ... damages that precluded settlement; ... [no] actual damages. *Matter of Bankers Trust Co.*, 658 F.2d 103, 108 (3d Cir.1981). We find none of these circumstances present here and will award prejudgment interest.

**682**

### D. *Attorney's Fees*

Attorney's fees will be denied. The case on which plaintiff principally relies, *Vaughn v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), is inapposite, as it permits a departure from the American rule only in circumstances evincing "callousness," "recalcitrance," and a general bad faith. We find none of these pejoratives applicable to this honest disagreement. The common fund cases plaintiff cites (*e.g., Mills v. Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593) are also inapplicable.

CONCLUSIONS OF LAW

1. The defendants were participants in a joint venture encompassing the shipment of 2,000 metric tons of soy meal to Alexandria.

2. The defendants are liable for dead freight in the amount of $120,000. The plaintiff made a reasonable attempt to mitigate its damages. From the dead freight claim will be deducted $27,000, representing the savings to the plaintiff in not having to stop in Alexandria.

3. The defendants shall be liable for prejudgment interest. The amount of such interest shall be the subject of a further hearing if the parties cannot resolve this issue themselves.

4. The plaintiff is not entitled to attorney's fees.

The court will enter the accompanying order.