**UNITED STATES of America**

v.

**USX CORPORATION; Atlantic Disposal Service, Inc.; Eastern Solid Waste Equipment Company, Inc.; A.C. Realty; Churchdale Leasing Inc.; Paul C. Murphy, Inc.; Attwoods, Inc.; Alvin White; Ave Maria Carite, As Executor of the Estate of Charles Carite; Stephen Miner, as Executor of the Estate of Charles Carite, Defendants.**

**Alvin WHITE; A.C. Realty; Anthony Carite, Jr., Ave Maria Carite, as Executor of the Estate of Charles Carite; Stephen Miner, as Executor of the Estate of Charles Carite; Atlantic Disposal Service, Inc.; USX Corporation; The Harleysville Mutual Insurance Company, Third–party Plaintiffs**

v.

**CHUBB GROUP OF INSURANCE COMPANIES; First State Insurance Company; The Harleysville Mutual Insurance Company; Interstate Fire and Casualty Company; Pennsylvania Manufacturers Insurance Company; Safety Mutual Ca-**

---

sualty Corporation; Wyle Laboratories, Inc.; Eastern Solid Waste Equipment Company, Inc.; Churchdale Leasing Inc.; A.C. Realty; Attwoods, Inc.; Paul C. Murphy, Inc.; Alvin H. White; Ave Maria Carite, as Executor of the Estate of Charles Carite; Stephen Miner, as Executor of the Estate of Charles Carite; Anthony Carite, Jr.; Utica Mutual Insurance Company, Third–party Defendants

Atlantic Disposal Service, Inc., Alvin White, A.C. Realty, Ave Marie Carite, as Executor of the Estate of Charles Carite, and Stephen Miner, as Executor of the Estate of Charles Carite, Appellants.

No. 94–5681.

United States Court of Appeals, Third Circuit.

Argued July 26, 1995.

Decided Oct. 23, 1995.

As Amended Dec. 14, 1995.

Sanford F. Schmidt (Argued), Gerston, Cohen & Grayson, Haddonfield, NJ, for Appellants Atlantic Disposal Service, Inc., Alvin White and A.C. Realty.

Joseph H. Kenney (Argued), Kenney & Kearney, Cherry Hill, NJ, for Appellants Ave Maria Carite and Stephen Miner, as Executors of the Estate of Charles Carite.

Albert M. Ferlo, Jr. (Argued), United States Dept. of Justice, Environment & Natural Resources Division, Washington, DC, for Appellee.

Before: BECKER and ALITO, Circuit Judges, VANASKIE, District Judge *.

## OPINION OF THE COURT

VANASKIE, District Judge.

This is an appeal from a declaratory judgment in favor of the United States and against defendants/appellants Atlantic Disposal Service, Inc. ("ADS"), the principal shareholders of ADS, Alvin White ("White") and Charles Carite ("Carite"), and A.C. Realty, decreeing that each is jointly and severally liable under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9601–75 (1995), for any future response costs incurred by the United States at a hazardous waste site located in Tabernacle, New Jersey (the "Tabernacle Site"). The district court held, on summary judgment motions, that each appellant was liable under CERCLA as a "person who ... accepted ... hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person." 42 U.S.C.A. § 9607(a)(4) (1995). ADS was held liable based upon evidence that its employees had transported approximately 200 drums of hazardous waste to the Tabernacle Site pursuant to an arrangement negotiated by a representative of ADS with the lessees of the Tabernacle Site. White and Carite were held liable based upon the district court's finding that they exercised control over the activities of ADS in 1976 and 1977, when the drums were deposited at the Tabernacle Site.[1] A.C. Realty, a partnership formed by Carite and White which owned the land and buildings occupied by ADS, was held liable on the ground that it was a joint venturer of ADS at the time of the disposal activities at issue here.

Although we agree that the record before the district court established, as a matter of law, the liability of ADS as a "transporter" under § 107(a)(4) of CERCLA, 42 U.S.C.A. § 9607(a)(4), we find that there are genuine issues of material fact pertaining to the potential liability of White, Carite and A.C. Realty. Specifically, as to White and Carite, the district court erred in assessing liability on the basis of day-to-day control of the affairs of ADS, as opposed to whether White and/or Carite actually participated in the decision to dump drums of hazardous waste at the Tabernacle Site. Because there are genuine disputes pertaining to the knowledge and participation of White and Carite in the Tabernacle Site dumping, summary judgment on their liability is inappropriate. As to A.C. Realty, we find that there are genuine issues concerning the intent of the parties to establish a joint venture relationship, thereby precluding summary judgment on this issue as well. Accordingly, we will affirm the declaratory judgment against ADS, but will vacate the declaratory judgment against White, Carite and A.C. Realty and remand to the district court for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Statutory Liability Scheme

"Congress enacted CERCLA to facilitate the cleanup of potentially dangerous hazardous waste sites, with a view to the preservation of the environment and human health." *Tippins, Inc. v. USX Corp.*, 37 F.3d 87, 92 (3rd Cir.1994). One of the principal purposes of CERCLA is "to force polluters to pay for costs associated with remedying their pollution." *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259–60 (3rd Cir. 1992).

CERCLA imposes liability for the costs of cleaning up a polluted site on four separate categories of parties:

(1) The owner and operator of a facility from which there has been a release or threatened release of hazardous substances necessitating responsive action, § 107(a)(1);

---

* The Honorable Thomas I. Vanaskie, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

1. Charles Carite was killed in an airplane accident in 1991, and the executors of his estate have been substituted as defendants. During the relevant time frame, Carite and White were the sole shareholders, directors and officers of ADS.

(2) A person who owned or operated such a facility at the time hazardous substances were deposited there, § 107(a)(2);

(3) A person who arranged for the transportation, disposal or treatment of hazardous substances at such a facility, § 107(a)(3); and

(4) A person who had accepted hazardous substances for transportation to a facility selected by that person, § 107(a)(4).[2]

Potentially responsible parties described by subsections (1) and (2) are generally known as "owners" and "operators"; those who fall under subsection (3) are generally known as "generators" and sometimes referred to as "arrangers"; and those who fall under subsection (4) are commonly known as "transporters." [3] *See Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261, 1271 (E.D.Pa. 1994). Liability of responsible parties is strict, *i.e.,* not dependent on a finding of fault. *See Tippins,* 37 F.3d at 92.[4] This appeal involves the question of whether the record before the district court established that ADS, White, Carite and/or A.C. Realty should be held liable as "transporters" of hazardous substances to the Tabernacle Site.[5]

## B. The Potentially Responsible "Transporter" Parties

White and Carite formed ADS in 1963. ADS was engaged in the business of hauling waste from commercial and industrial establishments. At the time of incorporation, Carite owned 50 percent of ADS' stock, White owned 49 percent of the stock, and the remaining one percent was owned by White's spouse.[6] From its incorporation until 1991, when its assets were sold, White and Carite were the sole officers and directors of ADS. White was the President of ADS; Carite was its Secretary/Treasurer.

As business expanded, White and Carite formed other corporations and partnerships.

---

**2.** Section 107(a) of CERCLA, in pertinent part, states:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by an other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the rea-

sonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title. 42 U.S.C.A. 9607(a) (1995).

The term "person" as used in § 107(a) is defined to include "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State or any interstate body." 42 U.S.C.A. § 9601(21).

**3.** CERCLA defines the terms "transport" and "transportation" as "the movement of a hazardous substance by any mode." 42 U.S.C.A. § 9601(26).

**4.** Strict liability is described as "liability that is imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care, i.e., actionable negligence." W. Page Keaton, et al., *Prosser & Keaton on the Law of Torts* § 75 at 534 (5th ed. 1984).

**5.** There is no dispute that the Tabernacle Site is a "facility" under CERCLA. Nor is there any challenge to the fact that there has been a release of hazardous substances from this facility.

**6.** By 1977, White and Carite each owned 50 percent of the ADS stock.

In 1971, they incorporated Eastern Solid Waste Equipment Company, Inc. ("ESWECO"). Although initially intended to operate as a distributor of refuse collection equipment, ESWECO essentially served as a maintenance company for the equipment used and buildings occupied by ADS. ESWECO was owned by relatives of White and Carite, but White and Carite served as the sole officers of that corporation.

Carite and White were also the sole partners in A.C. Realty, which was the owner of approximately 8.5 acres of land located in Mt. Laurel, New Jersey. Facilities constructed on a three-acre section of this parcel were leased to ADS. In the late 1970's, A.C. Realty leased another acre of land to Atlantic Recovery and Transfer Systems, Inc. ("ARTS"), which operated a waste transfer station adjacent to ADS.[7]

Also in the late 1970's, White and Carite established A.C. Enterprises, a partnership that leased containers and trucks to ADS. In 1982, A.C. Enterprises sold its assets to Churchdale Leasing, Inc., a Subchapter S corporation owned by White and Carite, who were its sole officers and directors. Churchdale Leasing continued to lease rolling stock and containers to ADS.

ESWECO, A.C. Realty, and A.C. Enterprises dealt solely with ADS and other companies established by White and Carite. Neither A.C. Realty nor A.C. Enterprises had any employees; ADS employees performed the work of these partnerships.[8]

## C. *The Tabernacle Site*

One of the ADS industrial accounts during the 1970's was a plant operated by USX Corporation in Camden, New Jersey. ADS hauled 55-gallon drums of liquid waste from the USX facility to a landfill in Gloucester County. When the Gloucester County landfill refused to accept the USX drums, arrangements were made to dispose of the drums on a 1-acre wooded parcel in Tabernacle, New Jersey, leased by Robert Ware, an ADS mechanic. Ware's understanding was that ADS would pay him a fixed amount for each drum dumped at the Tabernacle Site.

In 1976, Edith Ruhl, who was then Ware's wife, saw three trucks arrive at the Tabernacle Site and unload 55-gallon drums and other containers. Painted on the doors of the trucks were the words "Atlantic Disposal Services." An ADS dispatcher, William Milsop, acknowledged sending trucks containing drums of liquid waste to the Tabernacle Site.

In 1982, investigators of the Burlington County, New Jersey Health Department discovered 193 barrels and containers at the Tabernacle Site. Attached to at least one of the drums found at the Tabernacle Site were USX shipping documents.

Pursuant to a "Unilateral Administrative Order" issued by the United States Environmental Protection Agency ("EPA") in February of 1984 pursuant to § 106(a) of CERCLA, 42 U.S.C.A. § 9606(a) (1995),[9] ADS removed all drums and related waste from the Tabernacle Site. Analyses of the contents of the drums revealed a number of hazardous substances. Soil sampling disclosed a release of the hazardous substances to the environment. Sampling from monitoring wells confirmed the existence of groundwater contamination.

A Remedial Investigation and Feasibility Study ("RI/FS") was undertaken by EPA in 1985. As a result of the RI/FS, "special notice letters" were issued in July of 1988 to ADS and USX, affording them the opportunity to negotiate an agreement to perform the Remedial Design and Remedial Action ("RD/RA") proposed by EPA for the Taber-

---

7. Carite and White were each 50 percent shareholders in ARTS as well.

8. After the business operations of A.C. Enterprises were turned over to Churchdale Leasing, ADS continued to provide the employees to conduct the leasing business. ESWECO, A.C. Realty and A.C. Enterprises conducted their business at the Mt. Laurel facility leased to ADS.

9. Section 106(a) authorizes EPA to issue "such orders as may be necessary to protect the public health and welfare and the environment" from an imminent and substantial danger resulting from an actual or threatened release of hazardous substances.

nacle Site.[10] The ensuing negotiations resulted in an agreement by USX to perform the RD/RA. ADS, however, refused to participate in the environmental remediation work.

### D. Procedural History

In August, 1990, the United States commenced this cost recovery action pursuant to Section 107 of CERCLA, 42 U.S.C.A. § 9607 (1995), naming as defendants only USX and ADS. Liability was sought to be imposed on USX as a "generator," and ADS was alleged to be liable as a "transporter."

In July of 1992, the United States amended its complaint, adding as defendants White and Carite. The United States claimed that White and Carite were personally liable for the transportation of USX waste to the Tabernacle Site based upon their alleged pervasive control of ADS. The United States also added as defendants Churchdale Leasing, ESWECO, and A.C. Realty, alleging that these entities were "joint venturers" of ADS in connection with the transportation of wastes containing hazardous substances to the Tabernacle Site. USX filed cross-claims against each of these parties.[11]

In an opinion dated December 6, 1993, the district court ruled that ADS, A.C. Realty, Churchdale Leasing, and ESWECO had been engaged in a joint venture that encompassed the transportation of waste containing hazardous substances to the Tabernacle Site.[12] In separate Memoranda and Orders filed on January 12, 1994, the district court ruled that ADS, White and Carite were liable as "transporters" under § 107(a)(4) of CERCLA, and USX was liable as a generator under § 107(a)(3) of CERCLA. The district court, however, declined to grant summary judgment in favor of the United States on its damage claim of $1,778,518.89, finding that there were genuine issues of material fact "regarding the reasonableness of the RI/FS and whether the United States' response costs were incurred due to a 'needless and expensive monitoring study.'" (A. 127a.)

By letter dated March 11, 1994, the United States informed the district court that it had reached a settlement with USX and Attwoods, Inc.[13] Under the terms of the settlement, USX agreed to pay the United States $1.71 million of the $1.78 million claimed as recoverable response costs. The March 11, 1994 letter explained:

The settlement reached by the settling parties will encompass the following claims set forth in the pleadings in this action: (1) All the United States' claims in its amended complaint *except for a request for declaratory judgment for future response costs against the non-settling defendants;* and (2) All claims by and between USX and defendants Attwoods, Churchdale Leasing, [ESWECO and Paul C. Murphy, Inc.]. Thus, the settlement will resolve all triable issues related to the United States' claims and the United States has no need at this time to participate in the pretrial conference scheduled for March 16, 1994. [A. 180–81a, emphasis added.]

10. The "special notice letters" were issued pursuant to § 122(e) of CERCLA, 42 U.S.C.A. § 9622(e) (1995), which establishes the mechanism for negotiating an agreement with potentially responsible parties to undertake environmental remediation work.

11. In addition, USX named Anthony Carite, Jr., Charles Carite's brother and the operations manager of ADS, as a third-party defendant. Pursuant to a stipulation of dismissal, the USX claims against Anthony Carite, Jr. were later dismissed.

12. The December 6, 1993 Memorandum and Order addressed cross-motions for summary judgment filed by USX, as third-party plaintiff, and by ESWECO and Churchdale Leasing, two of the third-party defendants. The United States had separately moved for summary judgment on the joint venture issue. While the district court did not address the motion of the United States on this point, the parties have acknowledged that the ruling on USX's motion applies with equal force to the claims of the United States against A.C. Realty as an alleged joint venturer.

13. Attwoods had purchased the assets of ADS and the stock of Churchdale Leasing and ESWECO in March of 1991. Ownership of these companies was transferred to an Attwoods subsidiary known as Paul C. Murphy, Inc. The United States sued Attwoods and Paul C. Murphy, Inc. as purported corporate successors of ADS. USX filed cross-claims against these parties. In a Memorandum and Order dated January 11, 1994, the district court denied cross-motions for summary judgment on the issue of successor liability. (A. 100a–22a.)

In a footnote in this letter, the United States also stated:

> The Court has already ruled that the non-settling defendants are liable to the United States under Section 107(a) of CERCLA. Since the settlement will resolve the United States' claim for past costs, the only relief that the United States may ask this court for is a declaratory judgment of liability for future costs against the non-settling defendants. [A. 180a.] [14]

The United States did not participate in the final pretrial conference, which was conducted on March 16, 1994. A jury trial commenced in June of 1994. In light of the settlement with the United States, the trial was limited to cross-claims between USX and Attwoods, on the one hand, and the ADS Defendants on the other. [15] After several days of trial, USX, Attwoods, and the ADS Defendants announced that they had reached a settlement. The basic terms of the settlement were that the ADS Defendants would pay $2 million to USX, and in exchange would receive a general release from USX as well as an agreement by USX to indemnify them for any future response cost incurred by the United States at the Tabernacle Site. They also would obtain from Attwoods a general release with respect to the Tabernacle Site. (A. 59a–65a.)

At the time that counsel for the ADS Defendants placed on the record the settlement of the cross-claims, he requested "that this case ... be dismissed with prejudice...." (A. 61a.) Counsel for the United States objected to the dismissal with prejudice, observing:

> This Court already ruled each one of those defendants is a liable party here. A settlement with the USX and Attwoods defendants deals with our present and past costs, but it does not deal with potential future costs at the site.

I just want to let the Court know that if they were to move to dismiss with prejudice, the Government might oppose that motion at that time. [A. 66a–67a.]

On August 15, 1994, the United States filed a motion for a declaratory judgment against the ADS Defendants for future costs that may be incurred at the Tabernacle Sites. The ADS Defendants responded to the request for declaratory relief by moving for dismissal for failure to prosecute arising out of the fact that the United States had not participated in the preparation of the final pretrial order and had not attended the trial. In an Opinion dated September 20, 1994, the district court granted the United States' motion and denied the ADS Defendants' motion.

The ADS Defendants filed a timely notice of appeal, reasserting that the United States had effectively abandoned its request for declaratory relief. They also argue that the district court's summary judgment rulings on liability are erroneous.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 as the United States' claims arose under federal law. We have appellate jurisdiction under 28 U.S.C. § 1291.

## II.  DISCUSSION

### A.  The Failure to Prosecute Issue

The ADS Defendants contend that by failing to participate in the final pretrial conference and the trial itself, the United States effectively abandoned its claim for a declaratory decree as to future response costs, thus warranting dismissal of the United States' action against the ADS Defendants under Fed.R.Civ.P. 41(b) for failure to prosecute. We review the denial of a Rule 41(b) motion for an abuse of discretion. See Adams v. Trustees of the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863, 870 (3rd Cir.1994). Factors pertinent to the exercise of discretion in considering a

---

**14.** The non-settling parties were ADS, White, Carite and A.C. Realty, who will be referred to collectively as the "ADS Defendants."

**15.** USX sought recovery of $1.71 million paid to settle the United States' claims; $3.59 million incurred in conducting the RD/RA at the Taber-

nacle Site, and a declaration that ADS, White, Carite and A.C. Realty were liable for all future costs incurred in connection with the RD/RA at the Tabernacle Site. Attwoods sought recovery of $2.71 million purportedly spent in connection with the cleanup of the Tabernacle Site. (A. 147a–48a.)

failure to prosecute motion include: (1) the personal responsibility of the plaintiff; (2) prejudice to the defendants; (3) a history of dilatoriness; (4) the willfulness or bad faith of the plaintiff's conduct; (5) the adequacy of sanctions less drastic than dismissal; and (6) the meritoriousness of the plaintiff's claims. *Id.* The district court properly considered these factors in denying the ADS Defendants' motion to dismiss.

■ As the district court observed, there was no history of dilatoriness on the part of the United States; nor was there any evidence that the United States had acted in bad faith or with the intent to "ambush" the ADS Defendants, as they contend. Instead, when the United States announced its settlement with USX and Attwoods, it specifically informed the district court that declaratory relief with respect to future costs may be sought. The United States also indicated that, in light of the resolution of its claim for past response costs, it would not be participating in the pretrial conference or trial. There clearly was no need for the United States to attend a pretrial conference or sit through trial merely to preserve a claim for declaratory relief based solely on the district court's summary judgment rulings. When the ADS Defendants informed the district Court of their settlement, the United States once again reserved the right to seek the declaratory judgment to which it was entitled under § 113(g)(2) of CERCLA.[16] Under these circumstances, failure of the United States to participate in the final pretrial conference and trial cannot be considered to be bad faith conduct.

Moreover, in light of the district court's summary judgment rulings, the United States' claim for a declaratory judgment as

to liability for future response costs was clearly meritorious. Section 113(g)(2) of CERCLA, 42 U.S.C.A. § 9613(g)(2)(1995), provides that in any § 107 cost recovery action the district court shall issue a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action to recover further response costs.[17] As explained in *Kelley v. E.I. Du-Pont De Nemours & Co.*, 17 F.3d 836, 844 (6th Cir.1994):

> In providing for the recovery of response costs, Congress included language to insure that a responsible party's liability, once established, would not have to be relitigated.... The entry of [a] declaratory judgment as to liability is mandatory. *United States v. Kramer*, 757 F.Supp. 397, 412 (D.N.J.1991). The fact that future costs are somewhat speculative is 'no bar to a present declaration of liability.' *United States v. Fairchild Indus., Inc.*, 766 F.Supp. 405, 415 (D.Md.1991).

The ADS Defendants contend that the meritoriousness of the United States' claim does not erase the prejudice to them. But the prejudice claimed by the ADS Defendants flows from the effect of the declaratory judgment to which the United States was entitled as a result of the summary judgment liability determinations, and is not attributable to any dilatory conduct on the part of the United States.[18] The absence of the United States from the pretrial conference and trial did not impair the ADS Defendants' ability to defend against a claim for declaratory relief. While pursuit of the request for declaratory relief may seem to be unnecessary from a practical point of view (especially because USX has agreed to indemnify the ADS Defendants in connection with future

---

**16.** Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) (1995), in pertinent part, provides:
In every ... action [for recovery of response costs under § 107], the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. [Emphasis added.]

**17.** Essentially, § 113(g)(2) mandates collateral estoppel effect to a liability determination. Of course, a defendant would remain able to contest the amount of response costs or whether the

work undertaken was consistent with the national contingency plan. *See United States v. Fairchild Industries, Inc.*, 766 F.Supp. 405, 415 (D.Md.1991).

**18.** The ADS Defendants claim that the declaratory judgment will remain indefinitely as a lien on their real estate and otherwise impair their ability to obtain credit. They also suggest that the declaratory judgment was unnecessary because USX had agreed in a consent decree to remediate the Tabernacle Site.

response costs), it was certainly within the prerogative of the United States to seek such relief. Clearly, the ADS Defendants' claimed prejudice did not warrant dismissal of the United States cost recovery action. Accordingly, the district court did not abuse its discretion in declining to dismiss the claim for declaratory relief.

## B. *The Summary Judgment Liability Rulings*

We have plenary review of summary judgment rulings. *See Tippins,* 37 F.3d at 91. Our task is to determine whether the record before the district court disclosed a genuine issue as to any material fact and, if not, whether the United States was entitled to prevail on its liability theories against each of the ADS Defendants. A factual dispute is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the law governing the case. *Id.*

### 1. *The Liability of ADS as a "Transporter" Under § 107(a)(4) of CERCLA.*

■ Liability as a "transporter" is established by showing that a person accepted hazardous substances for transport and either selected the disposal facility or had substantial input into deciding where the hazardous substance should be disposed. *See Tippins,* 37 F.3d at 94. In this case, the evidence established that during the pertinent time frame ADS accepted for disposal drummed liquid waste generated by USX. It is undisputed that the drummed liquid waste of USX contained hazardous substances.

■ In support of its contention that ADS selected the Tabernacle Site for disposal of USX drummed liquid waste, the United States presented the testimony of the ADS mechanic who leased the Tabernacle Site and who had been paid by ADS to accept the drummed liquid waste for storage. The United States also presented the testimony

of the ADS mechanic's former wife, Edith Ruhl, who said that she witnessed the dumping of barrels from ADS trucks on the Tabernacle Site. Corroborating Ms. Ruhl's eyewitness observations was the testimony of the sole ADS dispatcher at the time, who said that he sent drummed liquid waste to the Tabernacle Site. At least one of the drums found at the site had attached to it USX shipping documents, and other drums bore the name "USX."

ADS contends that aerial photographs of the Tabernacle Site taken between 1978 and 1980 call into question the credibility of the testimony that ADS dumped drums at the Tabernacle Site. ADS points out that while Ruhl and her former husband testified that approximately 200 barrels were dumped in 1976 or 1977, the aerial photographs disclose less than one dozen "drum-like objects" at the site for the years 1978 through 1980.

As noted above, a factual dispute is "genuine" only if the evidence proffered by the non-moving party is sufficient to allow a reasonable jury to decide in favor of the non-moving party. When considered in the context of the testimony of Ware that ADS had paid him for storage of drummed waste at the Tabernacle Site, the eyewitness testimony of his former wife, who said she saw three ADS trucks dump barrels at the site, and the testimony of the ADS dispatcher that he sent up to three trucks of drummed waste to the Tabernacle Site, the interpretation of aerial photographs, confirming as it does the existence of *some* drums at the Tabernacle Site, is not sufficient to cause a reasonable jury to find that ADS did not transport USX drummed waste to the Tabernacle Site. Accordingly, the declaratory judgment that ADS is liable for future response costs will be affirmed.

### 2. *The Liability of White and Carite as "Transporters" Under § 107(a)(4) of CERCLA.*

The appeal from the summary judgment ruling against White and Carite presents an issue of first impression in this Court: what standard of liability did Congress intend to establish under CERCLA for principal

shareholders and officers of a closely-held corporation that transports hazardous substances? Congress did not directly address this issue in the statute itself.[19] Nor does the sparse legislative history answer the question presented here.[20]

White and Carite argue that the district court erred in concluding that a corporate officer "could be held liable for cleanup costs under CERCLA upon a showing of active involvement in the day-to-day operations of the [corporation]." (January 11, 1994 D.Ct. Slip.Op. at 6.) According to White and Carite, "[a] showing of personal participation in the conduct that violated the statute should be required because it is the most consistent with corporate law principles." (Appellants' Reply Br. at 8.)[21] The United States, generally relying upon cases that address the question of who may be held liable as an "operator" of a hazardous waste facility, contends that the district court correctly ruled that White and Carite are liable under § 107(a)(4) "[b]ased on their control and intimate involvement in the waste disposal and transportation business of ADS...." (United States Br. at 22.)

It is "axiomatic that the starting point for interpreting a statute is the language of the statute itself." *Tippins,* 37 F.3d at 92. Section 107(a)(4) of CERCLA provides that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release ... of a hazardous substance, shall be liable...." 42 U.S.C.A. § 9607(a)(4) (1995). In *Tippins,* we held that § 107(a)(4) imposed liability on a waste transportation corporation "not only if it ultimately selects the disposal facility, but also when it actively participates in the disposal decision to the extent of having had substantial input into which facility was ultimately chosen." 37 F.3d at 94. We explained that this " 'active participation' standard advances the objectives of CERCLA by recognizing the reality that transporters often play an influential role in the decision to dispose waste at a given facility." *Id.* at 95.

The express terms of § 107(a)(4), as interpreted in *Tippins,* limit liability to those "persons" who accept hazardous substances for transport and have a substantial input

19. "Some environmental statutes ... specifically name officers, agents, and/or shareholders as potentially liable parties, while still others refer directly to 'responsible corporate officers.' " Linda J. Oswald, *Strict Liability of Individuals Under CERCLA: A Normative Analysis,* 20 B.C. Envtl.Aff.L.Rev. 579, 586 n. 29 (1993). For example, Congress has declared that a civil penalty may be imposed against any "person" violating the Safe Drinking Water Act, 42 U.S.C.A. § 300g–3(g)(3)(A) (1991), and has defined "person" to include "officers, employees, and agents of any corporation...." 42 U.S.C.A. § 300(f)(12) (1991). CERCLA, however, does not expressly identify corporate officers and directors as potentially responsible parties.

20. As explained in *United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1253 (S.D.Ill.1984):

CERCLA was enacted on December 11, 1980 in the last days of the 96th Congress. The final version of the Act was conceived by an ad hoc committee of Senators who fashioned a last minute compromise which enabled the Act to pass. As a result, the statute was hastily and inadequately drafted. The only legislative history on the compromise is found in the floor debates.

The legislative history does not articulate any congressional intent with respect to the potential liability of corporate officers and individual shareholders. *See* Richard G. Dennis, *Liability of Officers, Directors and Shareholders Under CERCLA,: The Case for Adopting State Law,* 36 Vill.L.Rev. 1367, 1447 (1991).

21. The principles of limited liability to which White and Carite refer are explained in 3A William F. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1137 (perm. ed. rev. 1994), as follows:

An officer of a corporation who takes part in the commission of a tort by the corporation is personally liable for resulting injuries; but an officer who takes no part in the commission of the tort is not personally liable to third persons for the torts of other agents, officers, or employees of the corporation. Officers and directors may be held individually liable for personal participation in tortious acts even though they derived no personal benefit, but acted on behalf, and in the name of, the corporation, and the corporation alone was enriched by the acts.

It is not necessary that the 'corporate veil' be pierced in order to impose personal liability as long as it is shown that the corporate officer knowingly participated in the wrongdoing. However, it is necessary to pierce the corporate veil in order to impose personal liability upon a non-participating corporate officer.

822

into the selection of the disposal facility. Thus, § 107(a)(4) plainly imposes liability on corporate officers and shareholders if they participate in the liability-creating conduct.

The United States contends that Congress also intended to impose liability on those who control the affairs of a responsible corporation, irrespective of whether those in control actually participate in the liability-creating conduct. According to the United States, the courts have generally construed CERCLA as permitting recovery from those corporate officers who "participated in the management of or exercised control over a corporate entity." (United States Br. at 22.) Extending liability to those controlling a corporation, according to the United States, is consistent with "CERCLA's goal of 'placing the ultimate responsibility for cleanup on those responsible for problems caused by the disposal of chemical poisons.'" (United States Br. at 23.)

CERCLA, of course, is to be construed liberally to effectuate its goals. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3rd Cir.1992). "Liberal construction," however, may not be employed "as a means for filling in the blanks so as to discern a congressional intent to impose liability under nearly every conceivable scenario." *United States v. Cordova Chemical Co.*, 59 F.3d 584, 588 (6th Cir.1995). In light of the established principle of limited liability that protects corporate officers or employees who do not actually participate in liability-creating conduct, there must be some basis in the statute itself, beyond its general purpose, to support the conclusion that Congress intended to impose liability on those who control the corporation's day-to-day activities.

A statutory basis for imposing liability due to "actual control" of a corporation has been recognized in cases brought under § 107(a)(1) and (a)(2) of CERCLA, which explicitly cover both "owners" and "operators" of hazardous waste facilities. *See Lansford–Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1220–21 (3rd Cir.

1993). As we explained in *Lansford–Coaldale*, by making an "operator" of a facility a potentially responsible party, "it is at least clear that Congress has expanded the circumstances under which a corporation may be held liable for the acts of an affiliated corporation such that, when a corporation is determined to be the operator of a subsidiary or sister corporation, traditional rules of limited liability for corporations do not apply." *Id.* at 1221.[22] *See also United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26 (1st Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991) ("Congress, by including a liability category in addition to owner ('operator') ... implied that a person who is an operator of a facility is not protected from liability by the legal structure of ownership.")

The "actual control" test is a standard to be employed to determine whether a parent corporation is the actual "operator" of a hazardous waste facility and thus may be held directly liable without consideration of the factors necessary to pierce the corporate veil. "The actual control test imposes liability which would not be consistent with 'traditional rules of limited liability for corporations'...." *FMC Corp. v. U.S. Dept. of Commerce*, 29 F.3d 833, 843 (3rd Cir.1994). Under the "actual control" test for *operator* liability, "a corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised 'substantial control' over the other corporation. At a minimum, substantial control requires 'active involvement in the activities' of the other corporation." *Id.* However, it is not necessary to show that "a corporation controlled the environmental decisions of an affiliated corporation...." *Lansford–Coaldale*, 4 F.3d at 1222 n. 13. "[A] company may be considered an operator even if it did not exert control over the hazardous waste disposal decisions of an affiliated corporation, as long as there is otherwise sufficient indicia of substantial management control over the

---

**22.** *Lansford–Coaldale* was limited to the potential liability of a parent or sister corporation, and did not address "the scope of operator liability under CERCLA of corporate officers, directors, and employees." *Id.* at 1220 n. 10. This case, of course, does not present the question of the scope of operator liability under CERCLA for such individuals.

affairs of the affiliate." *Id.* at 1224 n. 17.[23] Thus, the "actual control" standard of *operator* liability balances "the benefits of limited liability with CERCLA's remedial purposes." *Lansford–Coaldale,* 4 F.3d at 1221.

Our adoption of the "actual control" standard was based upon a determination that "CERCLA's language ... indicates an *intent* to hold a corporation liable for the environmental violations of its subsidiaries and sister corporations, if it is otherwise determined to have operated the facility in question." *Id.* at 1221 n. 11 (emphasis added). But we did not find congressional intent to disregard the concept of limited liability in all contexts. On the contrary, we recognized that "owner" and "operator" liability were distinct concepts, and that traditional principles of corporate law would not permit "owner" liability to be extended to a corporate parent unless piercing the corporate veil was warranted. *Id.* at 1220. In short, "the long standing rule of limited liability in the corporate context remains the background norm...." *Id.* at 1221.

The cases upon which the United States relies to urge adoption of an "actual control" test under § 107(a)(4) of CERCLA do not address the question of whether CERCLA's language permits such a result. Cases such as *United States v. Carolina Transformer Co.,* 978 F.2d 832 (4th Cir.1992); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985); and *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 473–74 (D.N.J.1992), are not supportive of the United States' position because they concern the liability of a corporate officer, shareholder or director as an "operator" of a hazardous waste facility under § 107(a)(1) and (a)(2) of CERCLA, a category of potentially responsible parties not included in § 107(a)(4). Cases such as *United States v. Northeastern Pharmaceutical Co.,* 810 F.2d 726, 744 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Northernaire Plating Co.,* 670 F.Supp. 742, 747 (W.D.Mich.1987); *United States v. Bliss,* 667 F.Supp. 1298, 1307 (E.D.Mo.1987); *United States v. Ward,* 618 F.Supp. 884, 894–96 (E.D.N.C.1985); and *United States v. Mottolo,* 605 F.Supp. 898, 913–14 (D.N.H.1985), essentially support the position advanced by White and Carite because these cases concern liability under § 107(a)(3) for individuals who actually participated in arranging for the disposal of hazardous substances. None of these cases can be read as standing for the proposition that liability under section 107(a)(4) may be imposed based solely on control of the day-to-day activities of the corporate transporter without evidence of participation in the liability-creating conduct.[24]

---

**23.** The "actual control" standard for operator liability has been adopted by at least two other Courts of Appeals. *See, e.g., Jacksonville Electric Authority v. Bernuth Corp.,* 996 F.2d 1107 (11th Cir.1993); *United States v. Kayser–Roth Corp.,* 910 F.2d 24 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). Two other circuits have held that liability may be imposed on a parent corporation based upon its *authority to control* the affairs of its subsidiary. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992); *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). At least one circuit has held that "a parent corporation incurs operator liability pursuant to § 107(a)(2) of CERCLA, for the conduct of its subsidiary corporation, only when the requirements necessary to pierce the corporate veil are met." *United States v. Cordova Chemical Co.,* 59 F.3d at 590.

**24.** The few cases cited by the United States concerning "transporter" liability did not address the question presented here. For example, *Kai-ser Aluminum & Chem. Corp. v. Catellus Development Corp.,* 976 F.2d 1338, 1343 (9th Cir.1992), dealt with whether "transportation" of hazardous substances required movement of contaminated soil to a separate parcel of land. *City of New York v. Exxon Corp.,* 112 B.R. 540 (S.D.N.Y. 1990), concerned the liability of a parent corporation under § 107(a)(4). Although the district court agreed that "the analysis leading to a finding of direct liability on the part of shareholders or parent corporations under § 107(a)(3) and (4) is similar to the analysis under § 107(a)(2)," *id.* at 547, it did not address the fact that the "actual control" test gives meaning to Congress' use of the term "operator" in § 107(a)(2), a term which is absent from section 107(a)(4). It should also be noted that the district court found that the parent corporation could be held liable under veil piercing criteria. *Id.* at 552–53. In this case, the United States has not sought to pierce the corporate veil of ADS in order to impose liability on White and Carite.

Although it may be preferable to have the same liability standard apply to individual officers, shareholders and directors under each subsection of § 107(a), CERCLA's language fails to indicate that traditional concepts of limited liability are to be disregarded under § 107(a)(4). "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic National Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986). At the time CERCLA was enacted, it was firmly established that control of a corporation, in and of itself, was not a basis for imposing liability on a corporate officer for the actions of other corporate officers or employees. Instead, actual participation in the wrongful conduct was a prerequisite. *See, generally,* 3A William F. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* § 1137 (perm. ed. rev. 1994); Richard G. Dennis, *Liability of Officers, Directors and Stockholders Under CERCLA: The Case for Adopting State Law,* 36 Vill.L.Rev. 1367, 1411 (1991).

Congress could have specified that majority shareholders or officers of corporations engaged in the waste hauling business are personally responsible for releases of hazardous substances from disposal facilities selected by their companies. Congress could have utilized the phrase "owner or operator" of a transporter, just as it used the phrase "owner or operator" of a facility. It did neither. On the contrary, the sparse legislative history indicates that Congress anticipated that " 'issues of liability not resolved by this Act ... shall be governed by traditional and evolving principles of common law.' " Lynda J. Oswald, *Strict Liability of Individuals Under CERCLA: A Normative Analysis,* 20 B.C. Envtl.Aff.L.Rev. 579, 590 n. 41 (1993). Under these circumstances, it is appropriate to limit liability to those persons who are clearly made liable by the language Congress used—those who actively participate in the process of accepting hazardous substances for transport and have a substantial role in the selection of the disposal facility.[25]

This result is not inconsistent with CERCLA's " 'essential purpose' of making 'those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.' " *Lansford–Coaldale,* 4 F.3d at 1221. Our application of section 107(a)(4) as it was written does not immunize officers and directors who personally participate in liability-creating conduct. Although the scope of liability may be greater under section 107(a)(1) and (a)(2), CERCLA's language compels that result. It is not our prerogative to resolve the inconsistencies that permeate CERCLA.[26] Our task is to enforce congressional intent as it is made manifest in the language of the statute and legislative history. Our analysis of these rudimentary fonts of legislative intent compels us to apply § 107(a)(4) as written, a result that comports with traditional concepts of

---

**25.** As noted in the text at page 22 above, cases concerning the liability of corporate officers and employees as hazardous waste "generators" or "arrangers" of hazardous waste disposal under § 107(a)(3) have generally required actual participation in the liability-creating conduct. *See, e.g., Northeastern Pharmaceutical Co.,* 810 F.2d at 743–44 (liability imposed on plant supervisor who "actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal" of hazardous substances); *United States v. Ward,* 618 F.Supp. at 894–95 (corporate officer of an electrical equipment rebuilder was personally involved in the decision to dispose of transformer fluid containing hazardous substances); *United States v. Bliss,* 667 F.Supp. at 1306 (plant supervisor and chief executive officer who personally arranged for the disposal of liquid materials containing hazardous substances); *Commonwealth of Massachusetts v. Blackstone Valley Elec. Co.,* 777 F.Supp. 1036 (D.Mass.1991) (corporate officers entitled to summary judgment where the evidence established that they had not personally participated in conduct that violated CERCLA). Section 107(a)(3) of CERCLA is structured much like § 107(a)(4), imposing liability for specific conduct, and is thus unlike § 107(a)(1) and (a)(2), which imposes liability on the status of ownership or operation of a hazardous waste facility.

**26.** CERCLA is "notorious for its lack of clarity and poor draftsmanship." *Lansford–Coaldale,* 4 F.3d at 1221.

limited liability for officers, directors and shareholders.[27]

■ Accordingly, we conclude that liability may not be imposed under § 107(a)(4) solely on the basis of an officer's or shareholder's active involvement in the corporation's day-to-day affairs. Instead, there must be a showing that the person sought to be held liable actually participated in the liability-creating conduct.

■ Contrary to the assertion of White and Carite, however, liability under § 107(a)(4) is not limited to those who "personally participated in the transportation of hazardous wastes." (Appellants' Reply Br. at 8.)[28] It is not necessary that the officer personally accept the waste for transport. Cf., *United States v. Northeastern Pharmaceutical Co.*, 810 F.2d at 743 ("proof of personal ownership or actual physical possession of hazardous substances" is not a precondition for liability under § 107(a)(3)). Nor is it necessary that the officer participate in the selection of the disposal facility. Liability may be imposed where the officer is aware of the acceptance of materials for transport and of his company's substantial participation in the selection of the disposal facility. An officer who has authority to control disposal decisions should not escape liability under § 107(a)(4) when he or she has actual knowledge that a subordinate has selected a disposal site and, effectively, acquiesces in the subordinate's actions. Cf., *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3rd Cir. 1978) (a corporate president's knowledge and approval of wrongful acts "is sufficient actual participation in the wrongful acts" to make him individually liable).

■ While the district court held that White and Carite could be held liable based upon "[a]n abundance of evidence ... that White and Carite were active hands on managers of ADS during the time when the Tabernacle dumping occurred," (January 11, 1994 D.Ct. slip op. at 6), it also observed that there was "even greater support" for its conclusion in light of the fact that White and Carite were principals of a waste disposal company. The district court reasoned that "the likelihood is greatly diminished that the owners and operators of the company would be unaware of improper dumping." (*Id.* at 7.)

Although there was indeed substantial evidence that White and Carite were actively involved in the day-to-day affairs of ADS at the time of the disposal of waste drums at the Tabernacle Site, there was also countervailing evidence that White and Carite were not "hands on" managers during the relevant time period. Moreover, White submitted an affidavit disavowing knowledge of disposal of drums at the Tabernacle Site. (A. 188a.) Corroboration for White's assertion may be inferred from the fact that during the relevant time frame he supervised the sales and administrative staff and did not have active involvement in operational aspects of the business.

Anthony "Tony" Carite, Jr., the younger brother of Charles Carite, testified that

---

27. As one commentator has stated:
[T]raditional principles of corporate and agency law already provide us with adequate means for holding corporate officers and individual shareholders personally liable in appropriate circumstances. Corporate officers who personally participate in tortious acts may be held personally responsible; the corporate veil may be pierced to hold liable shareholders who have abused the corporate form, or who have used it to perpetrate a fraud. True these are inexact measures, and they may not impose liability upon corporate individuals in every instance where notions of justice or fairness would seem to dictate that it should fall, but CERCLA is an inexact statute. The problems inherent in CERCLA's poor drafting have been recognized since its enactment, and commentators have repeatedly urged its amendment. Unless and until Congress undertakes that de-
cidedly necessary step, the courts must apply the statute carefully to ensure that corporate individuals are not subjected to inappropriate or excessive liability. *Oswald*, 20 B.C. Envtl. Aff.L.Rev. at 636.

28. In support of this assertion, White and Carite cited *Lannett Co. v. Gratz*, 1994 WL 470344 (E.D.Pa., Aug. 30, 1994). *Lannett* involved application of collateral estoppel rules to impose liability on a corporate officer who had been convicted of violations of federal environmental laws in connection with his conduct in ordering that barrels containing chemicals be sent to a facility and ordering that they be poured down a storm drain. While *Lannett* involved a clear case of liability, it does not stand for the proposition that liability is limited only to those egregious circumstances.

Charles Carite had few specific responsibilities in the day-to-day business. Tony Carite was the operations manager of ADS. The ADS dispatcher and truck drivers at the time of the Tabernacle Site dumping testified that they reported directly to Tony Carite and had little, if any, involvement with Charles Carite.

While testimony of some ADS drivers, laborers and other plant employees concerning the active involvement of White and Carite in the day-to-day activities of ADS, if viewed as credible, could support an inference that White and Carite knew of the decision to dump drums at the Tabernacle Site and acquiesced in that decision, the testimony of other ADS employees, if credited, would not support that inference.[29] The evidence proffered by the United States was not so overwhelming as to render White and Carite's denial of knowledge completely implausible. Under these circumstances, the United States was not entitled to summary judgment against White and Carite. *See United States v. Premises Known as 717 So. Woodward St.*, 2 F.3d 529, 533–34 (3rd Cir.1993). Indeed, "issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Accordingly, the declaratory judgment in favor the United States and Against White and Carite will be reversed and remanded for further proceedings.

**29.** Although Stanley Moscowitz testified that he saw a check payable to Mr. Ware for disposal of the drums at the Tabernacle Site that purported to bear White's signature, that check has not been produced. Moscowitz did not join ADS until a number of years after the disposal at the Tabernacle Site occurred. Thus, Moscowitz's testimony does not preclude the existence of a genuine issue pertaining to White's knowledge of the improper dumping.

**30.** Both the parties and the district court addressed the joint venture issue on the assumption that New Jersey law controlled. In *Lansford–Coaldale*, we held that "it is federal common law, and not state law, which governs when corporate veil piercing is justified under CERCLA." 4 F.3d at 1225. State law, however, has been viewed as

### 3. The Liability of A.C. Realty As a Joint Venturer With ADS

■ Transporter liability under § 107(a)(4) is imposed on a covered "person," which CERCLA defines as including a joint venture. 42 U.S.C.A. § 9601(21) (1995). Each member of a joint venture "is considered the agent of the others, so that the act of any member within the scope of the enterprise is charged vicariously against the rest." *Pritchett v. Kimberling Cove, Inc.*, 568 F.2d 570, 579–80 (8th Cir.1977), *cert. denied*, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978). As noted above, the district court held that, as a matter of law, ADS, A.C. Realty, ESWECO, and A.C. Enterprises operated as a joint venture with regard to the waste disposal at the Tabernacle Site.[30]

■ "The *sine qua non* of a joint venture is a contract, express or implied; that is, an actual *agreement* between the parties." *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F.Supp. 665, 679 (D.N.J.1985). The agreement to create a joint venture may be implied based upon the conduct of the parties. *Wanaque Borough Sewerage Authority v. Township of West Milford*, 281 N.J.Super. 22, 32, 656 A.2d 448, 453 (1995). Other requisite elements of a joint venture are:

(1) The contribution by each party of money, property, effort, knowledge or some other asset to a common undertaking;

(2) The existence of a joint property interest in the subject matter of the venture;

(3) The right of mutual control or management of the venture; and

controlling in interpreting contracts that pertain to CERCLA liability. *See, e.g., Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 215 (3rd Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995); *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 406 (1st Cir.1993). We will not decide the question of whether the existence *vel non* of a joint venture for CERCLA liability should be decided under federal common law or state law. Because New Jersey law regarding joint ventures does not appear to be "hostile to the federal interests animating CERCLA," *id.* at 406, and different jurisdictions generally adopt the same criteria for the establishment of a joint venture, *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.*, 611 F.Supp. 665, 679 (D.N.J.1985), we will apply New Jersey law.

(4) An agreement to share the profits or losses of the venture.

*Inter–City Tire And Auto Center, Inc. v. Uniroyal, Inc.,* 701 F.Supp. 1120, 1126 (D.N.J.1988), *aff'd mem. sub nom. Uniroyal, Inc. v. Erbesh,* 888 F.2d 1382 (3rd Cir.1989) (table). The existence of a genuine dispute as to any of these elements precludes summary judgment. *Id.*

■ We need go no further than the first element, the existence of an agreement to form a joint venture, to conclude that a genuine issue of material fact precludes summary judgment on A.C. Realty's liability. Although the principle on which the district court relied in addressing this element, that the acts or conduct of the parties may imply the existence of an agreement, is correct standing alone, the existence of the requisite agreement is *not* the *only* inference that could be drawn from the facts of record.

In his affidavit, White disclaims any intention to form a joint venture. Undisputed facts tend to corroborate White's disclaimer. For example, separate financial statements were prepared for ADS, A.C. Realty, ESWECO, and A.C. Enterprises. Each entity maintained a separate bank account. Moreover, each enterprise was created at a different point in time, and the function of each entity appears to have evolved over time. Entities were formed not to share profits, but to maximize earnings for White and Carite. For example, the district court noted that ESWECO became a maintenance company so that White and Carite could take advantage of lower workers' compensation rates. It is not unusual for owners of closely

held corporations to establish separate entities that are intended to provide some insulation from tort liability or avoid high employment costs. From the facts of this case, a jury could rationally conclude that White's disclaimer of an intent to form a joint venture is credible.

We have previously held that "a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder." *Metzger v. Osbeck,* 841 F.2d 518, 521 (3rd Cir.1988). Where, as here, the facts permit competing inferences concerning the existence of an agreement to form a joint venture, the issue must be submitted to the fact finder.[31] Contrary to the assertion of the United States, the evidence it has proffered is not so overwhelming that a fact finder would necessarily have to infer the existence of the requisite agreement.[32] Accordingly, the United States was not entitled to summary judgment against A.C. Realty.

### III. CONCLUSION

For the foregoing reasons, the declaratory judgment of the district court is reversed in part and affirmed in part and this case is remanded to the district court for further proceedings consistent with this Opinion.

---

**31.** It should be noted that the two cases upon which the district court relied in holding that it could infer the existence of an implied agreement to form a joint venture from the parties' conduct, *Hellenic Lines, supra,* and *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1105 (E.D.N.Y.1985), *aff'd mem.,* 800 F.2d 1128 (2d Cir.1986), were decided following non-jury trials, with the district court making findings of fact pertaining to the existence of a joint venture agreement. In *Hellenic Lines,* the district court recognized that on the question of intent to share profit and losses, "credibility of witnesses becomes critical." 611 F.Supp. at 681. The only case cited by the United States as imposing liability on a member of a joint venture under CERCLA, *United States v. South Carolina Recycling and Dispos-*

*al, Inc.,* 653 F.Supp. 984, 1004–5 (D.S.Ct.1984), involved a written contract confirming the existence of a joint venture relationship.

**32.** The Tabernacle Site dumping occurred in 1976 or 1977. Much of the evidence upon which the United States relies, however, concerned the relationship of the parties during the 1980s. For example, inter-company loan agreements cited by the United States were executed in January of 1987. Insurance policies covered years subsequent to the alleged disposal period, and did not, as the United States claims, identify ADS, A.C. Realty, A.C. Enterprises and ESWECO as joint venturers.